# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

March 9, 2012

No. 11-10445

Lyle W. Cayce
Clerk

In the Matter of:  LRI III, LIMITED,

Debtor

---------------------------------------------------------------------------------------------------------

LRI III, LIMITED,

Appellee,

v.

BARRETT D. HALLA; LIFE REBUILDERS, INCORPORATED; LRI GRACE TOWNHOMES, L.L.C.,

Appellants.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:10-CV-1449

Before REAVLEY, ELROD, and HAYNES, Circuit Judges.

PER CURIAM:[*]

In this appeal, we are asked to determine whether the district court correctly concluded that the pertinent terms of LRI III, Ltd.'s bankruptcy plan

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 11-10445

are unambiguous. We hold that the pertinent terms are ambiguous and, therefore, REVERSE and REMAND.

## I.

This appeal presents questions concerning the manner in which the claim of Life Rebuilders, Inc. is to be repaid under debtor LRI III, Ltd.'s (LRI) bankruptcy plan. LRI is the operator of the Grace Townhomes, a multifamily housing facility in Ennis, Texas, which is rent and income restricted for low to moderate income persons. Life Rebuilders is the original developer of the Grace Townhomes.

LRI filed a chapter 11 bankruptcy petition in the United States Bankruptcy Court for the Northern District of Texas on July 2, 2004. LRI's plan was confirmed on July 29, 2005. Life Rebuilders holds an allowed unsecured claim against LRI for $932,500.[1]

The parties' dispute hinges upon whether there is ambiguity in LRI's plan with regard to the terms of payment governing Life Rebuilders' unsecured claim. The relevant portions of LRI's bankruptcy plan are summarized as follows:

- Charter Mac Corporation, the sole holder of certain multifamily housing revenue bonds issued in the original principal amount of $5,225,600.00, is classified as the plan's only Class 1 creditor.

- Class 2 of the plan consists of LRI's general unsecured creditors; however, there are no remaining Class 2 creditors and this class is irrelevant for the purposes of this appeal.

- Class 3 consists of subordinated unsecured creditors. The specific plan language, which is critical to this appeal, provides that "[a]ll payments to the holders of an Allowed Class 3 Claim shall be subordinated to any

---

[1] The other appellants, Barrett Halla and LRI Grace Townhomes, L.L.C., are not creditors of LRI.

No. 11-10445

payment owed to any holder of an Allowed Class 1 or Class 2 Claim."  Plan Article 4.3(b).

- Like Classes 1 and 2, "[t]he holders of Class 3 Claims shall be paid 100% of the Allowed Amount of Their Class 3 Claims."  Plan Article 4.3(a).

- Life Rebuilders is the plan's only Class 3 creditor.

- LRI must remit all its "Excess Cash Flow" to an Indenture Trustee for deposit into LRI's revenue fund. Plan Article 4.1(c).

- Excess Cash Flow is defined as "the net monthly operating income of the Debtor or the Reorganized Debtor after operating expenditures and capital expenditures."  Plan Article 1.38.

- Absent the express written consent of Charter Mac, no payment to Life Rebuilders can be accounted for as an expenditure. Thus, assuming Charter Mac withholds consent, Life Rebuilders' claim can only be repaid out of LRI's Excess Cash Flow.  *Id.*

- The first $120,000.00 of Excess Cash Flow generated by LRI must be transferred by the Indenture Trustee into a permanent account of the reserve fund.  Plan Article 4.1(c).

- Once the permanent account's balance exceeds $120,000.00, the Indenture Trustee must make payments: (1) to Charter Mac Corporation equal to 75% of LRI's Excess Cash Flow; and (2) to LRI equal to 25% of LRI's Excess Cash Flow.[2]  *Id.*

---

[2] The relevant language provides that "[t]he Indenture Trustee shall thereafter remit to Charter Mac Corporation 75% of Excess Cash Flow to be applied to the Fee Note and 25% of Excess Cash Flow to the Reorganized Debtor.  After the Fee Note is paid in full, 75% of Excess Cash Flow shall be transferred by the Indenture Trustee to the Redemption Account of the Reserve Fund and applied to the mandatory redemption of the Bonds [held by Charter Mac] on each January 1 commencing January 1, 2006, and 25% of Excess Cash Flow shall be disbursed to the Reorganized Debtor."

No. 11-10445

- Pursuant to an approved modification to LRI's plan, the City of Ennis will receive tax payments directly from LRI out of LRI's 25% share of the Excess Cash Flow.  Plan Article 6.11.

On October 21, 2009, LRI initiated this adversary proceeding against appellants, seeking, among other things, a declaratory judgment[3] regarding the manner in which Life Builders will be repaid under LRI's bankruptcy plan.[4] Specifically, LRI sought the declaratory judgment because LRI and Life Rebuilders disputed the nature of LRI's rights with regard to its 25% distribution of the Excess Cash Flow.  LRI argued that the bankruptcy plan unambiguously provides that LRI may retain the excess cash it receives from the Indenture Trustee.  Life Rebuilders disagreed, alleging that the bankruptcy plan was ambiguous because the plan failed to establish: (1) when Life Rebuilders would be repaid (i.e. the payment dates and/or intervals); (2) the amounts or percentage of funds it would receive; and (3) the specific funds with which Life Rebuilders' claim would be fully repaid.  Nevertheless, according to Life Rebuilders, the plan required LRI to use its 25% share of the Excess Cash Flow to make payments to Life Rebuilders and to the City of Ennis.[5]

The bankruptcy court determined that LRI's plan was ambiguous.  On April 9, 2010, after hearing live testimony and consulting extrinsic evidence, the court found that "the most natural reading of the settlement, plan and disclosure statement is consistent with [the appellants'] position that after the reserve fund

---

[3] The appellants counterclaimed with their own declaratory judgment action seeking clarification of the terms of repayment of Life Rebuilders' claim under the plan.  For the purposes of this opinion, we will refer to LRI's declaratory judgment claim and the appellants' declaratory judgment counterclaim as the same action.

[4] Before trial in the bankruptcy court, the parties settled all of the other claims and counterclaims raised in the adversary proceeding, leaving the declaratory judgment action as the only live dispute.

[5] Neither party disputes that the plan contemplates LRI making payments to the City of Ennis with proceeds of the Excess Cash Flow.

4

reaches $120,000.00, 75 percent of the excess cash flow will be paid to Charter Mac and 25 percent will be used to be paid to the City of Ennis and to Life Rebuilders."  On April 16, 2010, the bankruptcy court issued a declaratory judgment in favor of Life Rebuilders, declaring that, pursuant to LRI's bankruptcy plan, "[a]fter the Reserve Fund reaches $120,000, 75% of Excess Cash Flow shall be paid to Charter Mac Corporation and 25% of Excess Cash Flow shall be used to pay the claims of the City of Ennis and Life Rebuilders."

LRI appealed the bankruptcy court's declaratory judgment to the district court.  The district court reversed the bankruptcy court because, in its view, the plan unambiguously stated that 25% of the Excess Cash Flow would be remitted to LRI and did not provide for any subsequent transfer of the cash to Life Rebuilders.  The district court acknowledged that "the Plan does not explicitly state the terms of repayment for Life Rebuilders' claim" but determined that, when construing the plan as a whole, "the Plan itself provides sufficient priority and payment rules to logically sort out the intent of the parties without reference to extrinsic evidence."  Life Rebuilders appealed the district court's decision to this court.

## II.

We apply the same standard of review to the bankruptcy court's decision as was applied by the district court.  *In re Amco Ins.*, 444 F.3d 690, 694 (5th Cir. 2006) (citing *Total Minatome Corp. v. Jack/Wade Drilling, Inc. (In re Jack/Wade Drilling, Inc.)*, 258 F.3d 385, 387 (5th Cir. 2001)).  "The bankruptcy court's findings of fact are reviewed under a clear error standard, while conclusions of law are reviewed *de novo*."  *Id.* (citing *Jack/Wade Drilling*, 258 F.3d at 387).

We interpret bankruptcy plans in accordance with the rules of contract interpretation.  *McFarland v. Leyh (In re Tex. Gen. Petroleum Corp.)*, 52 F.3d 1330, 1335 (5th Cir. 1995) (citing *In re Stratford of Tex., Inc.,* 635 F.3d 365, 368

(5th Cir. 1981)). A district court's determination regarding whether a contract is clear or ambiguous presents a question of law, which we review *de novo*. *Id.* (citing *Stratford*, 635 F.3d at 368). At the same time, we remain mindful that a bankruptcy court's interpretation of a plan that it previously confirmed is "entitled to deference." *In re O'Connor*, 258 F.3d 392, 401 (5th Cir. 2001). If a contract is ambiguous, a court's determination of the parties' intent from parol evidence involves questions of fact, which we review for clear error. *McFarland*, 52 F.3d at 1335-36 (citing *Stratford*, 635 F.3d at 368).

The parties agree that LRI's bankruptcy plan should be construed in accordance with Texas law. "In construing a contract under Texas law, courts must examine and consider the entire writing and give effect to all provisions such that none are rendered meaningless." *Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 497 (5th Cir. 2002) (citing *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983)). "Where the contract language is clear and definite, the contract is not ambiguous and the court must apply the plain the language as a matter of law." *Id.* (citing *DeWitt Cnty. Elec. Coop., Inc. v. Parks*, 1 S.W.3d 96, 100 (Tex. 1999)). At the same time, courts are "required to interpret '[c]ontract provisions . . . so as to avoid meanings that produce unreasonable, oppressive, or absurd results.'" *Mid-Continent Cas. Co. v. Bay Rock Operating Co.*, 614 F.3d 105, 114 (5th Cir. 2010) (quoting *Cont'l Sav. Ass'n v. U.S. Fid. & Guar. Co.*, 762 F.2d 1239, 1245 (5th Cir. 1985)).

A contractual ambiguity exists when "the agreement is reasonably susceptible to more than one interpretation." *Int'l Turbine Servs.*, 278 F.3d at 497 (citing *Parks*, 1 S.W.3d at 100). Once an ambiguity arises, the court may consider the parties' interpretation of the contract and "'admit extraneous evidence to determine the true meaning of the instrument.'" *David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450-51 (Tex. 2008) (quoting *Nat'l Union Fire Ins.*

No. 11-10445

*Co. Of Pittsburgh, Penn. v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 (Tex. 1995) (per curiam)).

As set forth below, the district erred in finding that LRI's plan was unambiguous.

**1.    The District Court Misconstrued the Plan's Subordination Clause**

First, the district court misconstrued the plan's subordination clause, Article 4.3(b). Article 4.3(b) provides that "[a]ll payments to the holders of an Allowed Class 3 Claim shall be subordinated to *any payment owed to* any holder of an Allowed *Class 1 or Class 2 Claim*." Plan Article 4.3(b) (emphasis added). The district court "interpret[ed] the clause plainly: a Class 3 Claim will not be paid until all Class 1 claims are paid." According to the district court, such an interpretation was necessary because the "[subordination] clause would be rendered meaningless if the Plan allows repayment of Life Rebuilders' Class 3 claim before Charter Mac's Class 1 claim is fully paid."

However, contrary to the district court's assertion, the subordination clause does not require the full satisfaction of Charter Mac's claim before Life Rebuilders can receive distributions for their claim. The language merely states that Life Rebuilders is subordinated to "any payment owed to" Charter Mac. Article 4.1(c) of LRI's plan unequivocally sets forth the "payments" that are "owed to" Charter Mac: 75% of LRI's Excess Cash Flow. Likewise, Article 4.1(c) clearly establishes that Charter Mac will never be owed any of the remaining 25% of the Excess Cash Flow that the plan allocates to LRI.[6]

Therefore, we conclude, consistent with the bankruptcy court's determination, that Life Rebuilders is subordinated to Charter Mac only to the

---

[6] The district court reached the same conclusion; it found that "the plan explicitly states the Reorganized Debtor is to receive the twenty-five percent of Excess Cash Flow not allotted to the repayment of Charter Mac's Class 1 claims." Thus, by definition, the 25% will never be paid to Charter Mac.

extent that Life Rebuilders seeks to receive a portion of the 75% Excess Cash Flow owed to Charter Mac. Throughout this case, Life Rebuilders has only asserted a right to receive the remaining 25% of Excess Cash Flow that is distributed to LRI. There is simply no language in the plan, and certainly no unambiguous language, subordinating Life Resources' right to distributions out of this 25% of Excess Cash Flow until after Charter Mac's claim is fully satisfied. Thus, the district court erred in determining that the plan unambiguously required such subordination.[7]

**2.    The District Court Erred in Finding that Life Rebuilders was Unambiguously not Entitled to Receive Distributions out of LRI's 25% of Excess Cash Flow**

Relying on its understanding of the subordination clause, the district incorrectly determined that the plan unambiguously does not give Life Rebuilders the right to receive distributions out of the remaining 25% of Excess Cash Flow. The court specifically found as follows:

> Life Rebuilders is not explicitly or implicitly given a right under the Plan to the twenty-five percent of Excess Cash Flow. Therefore, under the Court's interpretation of the Plan, Life Rebuilders does not have a right to any of the Excess Cash Flow as long as there are unpaid Class 1 claims. This is the only reasonable interpretation based on the priority rules governing the parties' claims because, until the Class 1 claims are fully paid, Life Rebuilders claims are subordinated and are to remain unpaid under the Plan.

As discussed above, the subordination clause does not provide any support for the theory that Life Rebuilders is unable to receive any distributions until after Charter Mac's claim is fully satisfied. Thus, the only remaining question is whether the plan unambiguously entitles LRI to retain its 25% share of the

---

[7] Likewise, the district court erred in finding that the construction of the subordination clause advocated by Life Rebuilders would render the clause meaningless. Because the clause only subordinates Life Rebuilders' rights with regard to Charter Mac's 75% share of Excess Cash Flow, the clause's proper meaning is wholly unaffected by whether Life Rebuilders receives distributions out of the remaining 25% share of Excess Cash Flow.

No. 11-10445

Excess Cash Flow, thus preventing the distribution of such funds to Life Rebuilders. Upon considering the document as a whole, we conclude that plan is ambiguous on this issue.

LRI posits that Article 4.1(c) of the plan clearly contemplates that LRI can retain 25% of the Excess Cash Flow. Such a theory is tenable when viewing Article 4.1(c) in isolation. Under Texas law, however, we must interpret plan's terms not simply as they exist in isolation but as they function within the document as a whole. *See In re Ford Motor Co.*, 211 S.W.3d 295, 298 (Tex. 2006) (contract provisions "cannot be read in isolation; all of the provisions must be considered with reference to the whole") (citing *Coker*, 650 S.W.2d at 393).

Upon considering the document as a whole, however, we conclude that the plan merely provides that 25% of Excess Cash Flow must be initially distributed to LRI. Critically, the plan is devoid of language stating: (1) that LRI may retain its Excess Cash Flow distributions; and (2) the manner in which Life Rebuilders will be fully repaid as required by Article 4.3(a).[8]

A previous modification to the plan explicitly provides that LRI will use the 25% of Excess Cash Flow to make payments to one of its creditors, the City of Ennis. Thus, contrary to LRI's argument, LRI is not permitted to retain this money and use it for its own purposes. The plan contemplates that the funds may be used to satisfy a creditor. This begs the question of whether the funds may also be used to satisfy LRI's debt to Life Rebuilders. The plan is ambiguous on this point.

Morever, based on our review of the potential sources of repayment, there is no language in the plan indicating how or when Life Rebuilders' claim will be paid. In addition to the 25% of Excess Cash Flow, there are two other potential

---

[8] With regard to this latter point, the district court reached the same conclusion: "The Plan does not explicitly state with what money Life Rebuilders' claims are to be repaid."

sources of repayment.[9]   First, although it appears unlikely, Life Rebuilders'
claim could potentially be repaid as part of LRI's expenditures.  Under Article
1.38, an expenditure is, by definition, separate and apart from the Excess Cash
Flow.   However, these expenditure funds can only be used to satisfy Life
Rebuilders' claim if Charter Mac provides express written consent to the
payment arrangement.  Without Charter Mac's express written consent, Life
Rebuilders' claim can never be paid as an expenditure.  Thus, although the
expenditure route is a possibility, it is a passage that can only be navigated with
the assistance of Charter Mac.[10]

The other potential source of repayment of Life Rebuilders' claim is out of
the 75% of Excess Cash Flow, once Charter Mac's claim has been fully satisfied.
However, Article 4.1(c) is completely silent on where the 75% will be distributed
once Charter Mac is repaid.  Thus, although some or all these funds could
potentially be distributed to Life Rebuilders, the plan does not unambiguously
mandate such a result.[11]

Accordingly, like the bankruptcy court, we hold that the plan is ambiguous
with regard to the manner in which Life Rebuilders' claim will be satisfied and
the plan does not unambiguously permit LRI to retain its distribution of the
Excess Cash Flow.

---

[9] Technically, there is only one source of repayment: LRI's revenue.  However, the plan
splits LRI's revenue three ways: (1) towards operating and capital expenditures; (2) 75% of
Excess Cash Flow to Charter Mac; and (3) 25% of Excess Cash Flow to LRI.  Thus, based on
this allocation, we treat Life Rebuilders as having three potential sources of repayment.

[10] Based on the plan, Charter Mac has no incentive to grant consent.  Any payment to
Life Rebuilders as an expenditure will necessarily decrease the available Excess Cash Flow
by the amount of the payment.  This will, correspondingly, decrease the 75% of Excess Cash
Flow that is distributed to Charter Mac.

[11] The plan's failure to explicitly redistribute the 75% Excess Cash to Life Rebuilders
potentially indicates that all other creditors' claims are meant to be satisfied by the time
Charter Mac is repaid.

## 3.     The District Court's Erred in Rejecting Life Rebuilders' Arguments

After finding that LRI's plan was unambiguous, the district court proceeded to reject Life Rebuilders' theory that the bankruptcy court correctly interpreted the plan as granting it the right to share in the 25% of Excess Cash Flow.   We briefly address our concern with two of the district court's justifications for rejecting Life Rebuilders' theory.

First, the district court discounted Life Rebuilders' claim to the 25% of Excess Cash Flow because such a claim was "inconsistent with the definition of Excess Cash Flow, which [under Article 1.38] states that 'absent the express written consent of Charter Mac, no payment to Life [Rebuilders] shall be considered an expenditure.'" Contrary to the district court's conclusion, there is no inconsistency between Life Rebuilders' theory and Article 1.38.  By definition, LRI's expenditures are distinct from LRI's Excess Cash Flow.  *See* Plan Article 1.38.  Excess Cash Flow, which equates to LRI's net income or profit, is all cash that remains after all of LRI's operating and capital expenditures are paid.  Life Rebuilders only seeks is to share in this Excess Cash Flow.  The distribution of such funds to Life Rebuilders will not offend Article 1.38 in any fashion.

Second, the district court dismissed Life Rebuilders' contention that it would be illogical to allocate Excess Cash Flow to LRI instead of first distributing such funds to Life Rebuilders, a creditor of LRI's bankruptcy estate.  However, under the circumstances of this case, the distribution chosen by the district court—which would place the debtor's receipt of profit ahead of any distribution to a creditor that is supposed to be paid in full—produces an illogical result.

## III.

We REVERSE because the district erred in finding that LRI's plan was unambiguous.  The district court did not resolve whether the bankruptcy court's

interpretation of the ambiguity in LRI's plan was clearly erroneous. Accordingly, we REMAND this case to the district court so that it can resolve that question.